**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDELIN ALTUVE, BRANDY DANIELS, DIEGO GALEANA, APRIL GILLENS, JANDREA GLENN, ELIZABETH HALL, SAVANNA JARRELL, LASZLO KOVACS, CORI LAU, MICHELLE LYLES, CHRISTINA MARTINSON, MELISSA MEJIA, CHEY'NA MICCICHE, JULIA MILTON, MICHAEL MORROW, STACY MUSTO, GLADYS OKOLO, LIDIA TILAHUN, individually, and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>        v.<br><br>NURTURE, INC.,<br><br>      Defendant. | **Case No.:**<br><br>**Jury Trial Demanded** |

# CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

PARTIES ...........................................................................................................................2

JURISDICTION AND VENUE ..........................................................................................4

FACTUAL ALLEGATIONS ..............................................................................................4

    The Subcommittee Report .............................................................................................4

    Arsenic in Defendant's Baby Food ...............................................................................6

    Lead in Defendant's Baby Food ....................................................................................7

    Cadmium in Defendant's Baby Food ............................................................................8

    Mercury in Defendant's Baby Food ..............................................................................9

    Defendant's Baby Food .................................................................................................9

    Consumer Expectations Regarding Baby Food...........................................................11

    Plaintiff Edelin Altuve Purchased Defendant's Contaminated Baby Food .............14

    Plaintiff Brandy Daniels Purchased Defendant's Contaminated Baby Food ..........14

    Plaintiff Diego Galeana Purchased Defendant's Contaminated Baby Food ...........14

    Plaintiff April Gillens Purchased Defendant's Contaminated Baby Food ..............15

    Plaintiff Jandrea Glenn Purchased Defendant's Contaminated Baby Food ............15

    Plaintiff Elizabeth Hall Purchased Defendant's Contaminated Baby Food ............15

    Plaintiff Savanna Jarrell Purchased Defendant's Contaminated Baby Food ..........16

    Plaintiff Laszlo Kovacs Purchased Defendant's Contaminated Baby Food ............16

    Plaintiff Cori Lau Purchased Defendant's Contaminated Baby Food ....................16

    Plaintiff Michelle Lyles Purchased Defendant's Contaminated Baby Food ...........17

    Plaintiff Christina Martinson Purchased Defendant's Contaminated Baby Food.....17

i

Plaintiff Melissa Mejia Purchased Defendant's Contaminated Baby Food ...........................17

Plaintiff Chey'na Micciche Purchased Defendant's Contaminated Baby Food ...................18

Plaintiff Julia Milton Purchased Defendant's Contaminated Baby Food .............................18

Plaintiff Michael Morrow Purchased Defendant's Contaminated Baby Food......................18

Plaintiff Stacy Musto Purchased Defendant's Contaminated Baby Food.............................19

Plaintiff Gladys Okolo Purchased Defendant's Contaminated Baby Food ..........................19

Plaintiff Lidia Tilahun Purchased Defendant's Contaminated Baby Food ...........................19

Facts Relating to All Plaintiffs and Class Members................................................19

CLASS ALLEGATIONS ........................................................................22

COUNT 1 (On Behalf of Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass) Violation of California Business & Professions Code §§ 17200, *et seq.* for Engaging in Unlawful, Unfair, and Deceptive Business Acts or Practices........................................27

COUNT 2 (On Behalf of Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass) Violation of California Consumer Legal Remedies Act, Cal. Civ. Code § 1770, *et seq*..............30

COUNT 3 (On Behalf of Plaintiff Glenn and the Colorado Subclass) Violation of Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§6-1-101, *et seq*....................................33

COUNT 4 (On Behalf of Plaintiff Altuve and the Florida Subclass) Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") Fla. Stat. § 501.201, *et seq* .................35

COUNT 5 (On Behalf of Plaintiff Martinson and the Georgia Subclass) Violation of Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") O.C.G.A. §§ 10-1-370, *et seq* ...............38

COUNT 6 (On Behalf of Plaintiff Martinson and the Georgia Subclass) Violation of Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.* .......................................40

COUNT 7 (On Behalf of Plaintiff Galeana and the Illinois Subclass) Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq* ........42

COUNT 8 (On Behalf of Plaintiff Jarrell and the Kentucky Subclass) Violation of Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.110, *et seq.* ........................................45

COUNT 9 (On Behalf of Plaintiff Lyles and the Maryland Subclass) Violation of the Maryland Consumer Protection Act, Md. Code, Comm. Law §§ 13-301, *et seq.* ("MCPA") ......47

COUNT 10 (On Behalf of Plaintiff Milton and the Michigan Subclass) Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 ("MCPA"), *et seq.* ..............50

COUNT 11 (On Behalf of Plaintiff Musto and the Missouri Subclass) Violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Stat. § 407.010, *et seq* .........................53

COUNT 12 (On Behalf of Plaintiff Lau and the Nevada Subclass) Violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0915 ("NDTPA") ....................................55

COUNT 13 (On Behalf of Plaintiff Hall and the New Hampshire Subclass) Violation of New Hampshire Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. §§ 358-A:1, *et seq* ........................................................................................58

COUNT 14 (On Behalf of Plaintiffs Daniels, Mejia, and the North Carolina Subclass) Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("NCUDTPA") .........................................................................................60

COUNT 15 (On Behalf of Plaintiff Altuve and the North Dakota Subclass) Violation of the North Dakota Unlawful Sales or Advertising Practices, N.D.C.C. § 51-15, *et seq.* .....................62

COUNT 16 (On Behalf of Plaintiff Kovacs and the Tennessee Subclass) Violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Stat. § 47-18-101, *et seq.* .....................65

COUNT 17 (On Behalf of Plaintiff Okolo and the Virginia Subclass) Violation of the Virginia Consumer Protection Act of 1977 ("VCPA"), Va. Code § 59.1-196, *et seq.* ...............................68

COUNT 18 (On Behalf of Plaintiff Gillens and the Washington D.C. Subclass) Violation of Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.* ("CPPA") .........................70

COUNT 19 (On Behalf of All Plaintiffs and the Class and Each State Subclass) Fraudulent Concealment ........................................................................................................73

COUNT 20 (On Behalf of All Plaintiffs and the Class and Each State Subclass) Unjust Enrichment ...........................................................................................................74

PRAYER FOR RELIEF ...........................................................................................76

iii

Plaintiffs EDELIN ALTUVE, BRANDY DANIELS, DIEGO GALEANA, APRIL
GILLENS, JANDREA GLENN, ELIZABETH HALL, SAVANNA JARRELL, LASZLO
KOVACS, CORI LAU, MICHELLE LYLES, CHRISTINA MARTINSON, MELISSA MEJIA,
CHEY'NA MICCICHE, JULIA MILTON, MICHAEL MORROW, STACY MUSTO,
GLADYS OKOLO, and LIDIA TILAHUN, ("Plaintiffs"), individually, and on behalf of all
others similarly situated, by and through counsel at Dann Law and Zimmerman Law Offices,
P.C., bring this Class Action Complaint against Defendant NURTURE, INC. ("Defendant"), as
follows:

## INTRODUCTION

1.      On February 4, 2021, the United States House of Representatives Committee on
Oversight and Reform's Subcommittee on Economic and Consumer Policy (the "House
Subcommittee") released a report entitled "Baby Foods Are Tainted with Dangerous Levels of
Arsenic, Lead, Cadmium, and Mercury" (the "Subcommittee Report"). *See generally*,
Subcommittee Report, attached hereto as Exhibit 1. According to the Subcommittee Report, which
cites test results provided by baby food companies to the Committee, several brands of baby food
sold in the United States contain unsafe levels of toxic heavy metals, including those sold by
Defendant. *See*, Subcommittee Report, p. 2.

2.      Given the health risks associated with high levels of toxic heavy metals, the mere
presence of these substances in baby food is a material fact to consumers. To an even greater
extent, the unreasonably high levels of toxic heavy metals found in Defendant's baby food
products sell is material. Consumers—such as Plaintiffs and members of the Classes (defined
below)—are unwilling to purchase baby food that contains unsafe levels of toxic heavy metals.

3.      Defendant knew about the presence and levels of toxic heavy metals in its baby food. Defendant also knew about the health effects of exposure to toxic heavy metals and the impact they have on developing children and babies. Defendant omitted and concealed these material facts from Plaintiffs and Class members. Defendant furthered their unfair and deceptive course of conduct by making representations about the wholesomeness and health benefits of their baby food.

4.      Accordingly, Plaintiffs bring this suit on behalf of themselves and Classes of similarly situated individuals for out-of-pocket losses, compensation, and all other relief to which they are lawfully entitled, resulting from Defendant's sale of baby food that contained unsafe levels of toxic heavy metals.

## **PARTIES**

5.      Plaintiff EDELIN ALTUVE ("Altuve") is a natural person, and resident and citizen of North Dakota.

6.      Plaintiff BRANDY DANIELS ("Daniels") is a natural person, and resident and citizen of North Carolina.

7.      Plaintiff DIEGO GALEANA ("Galeana") is a natural person, and resident and citizen of Illinois.

8.      Plaintiff APRIL GILLENS ("Gillens") is a natural person, and resident and citizen of Washington, D.C.

9.      Plaintiff JANDREA GLENN ("Glenn") is a natural person, and resident and citizen of Colorado.

10.     Plaintiff ELIZABETH HALL ("Hall") is a natural person, and resident and citizen of New Hampshire.

2

11.    Plaintiff SAVANNA JARRELL ("Jarrell") is a natural person, and resident and citizen of Kentucky.

12.    Plaintiff LASZLO KOVACS ("Kovacs") is a natural person, and resident and citizen of Tennessee.

13.    Plaintiff CORI LAU ("Lau") is a natural person, and resident and citizen of Nevada.

14.    Plaintiff MICHELLE LYLES ("Lyles") is a natural person, and resident and citizen of Maryland.

15.    Plaintiff CHRISTINA MARTINSON ("Martinson") is a natural person, and resident and citizen of Georgia.

16.    Plaintiff MELISSA MEJIA ("Mejia") is a natural person, and resident and citizen of North Carolina.

17.    Plaintiff CHEY'NA MICCICHE ("Micciche") is a natural person, and resident and citizen of California.

18.    Plaintiff JULIA MILTON ("Milton") is a natural person, and resident and citizen of Michigan.

19.    Plaintiff MICHAEL MORROW ("Morrow") is a natural person, and resident and citizen of California.

20.    Plaintiff STACY MUSTO ("Musto") is a natural person, and resident and citizen of Missouri.

21.    Plaintiff GLADYS OKOLO ("Okolo") is a natural person, and resident and citizen of Virginia.

22.    Plaintiff LIDIA TILAHUN ("Tilahun") is a natural person, and resident and citizen of California.

23.    Defendant NURTURE, INC. is a Delaware benefit corporation with its principal place of business in New York, New York. Nurture sells its baby food under the "HappyBABY" brand name ("HappyBABY Brand Baby Food"). HappyBABY Brand Baby Food is sold nationwide, including throughout the state of New York.

## JURISDICTION AND VENUE

24.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d).  As set forth below, the proposed Classes each include more than 100 individuals, and the amount of controversy, in the aggregate, exceeds the sum of $5,000,000 exclusive of interest and costs, given Defendant's market reach and the approximate number of putative Class members in the United States.  Some members of the proposed Classes are citizens of states different from Defendant.

25.    Venue is proper in this district under 28 U.S.C. § 1391, because Defendant has its headquarters in this district, and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### *The Subcommittee Report*

26.    Inorganic arsenic, lead, cadmium, and mercury are toxic heavy metals (the "Toxic Heavy Metals"). The United States Food and Drug Administration ("FDA") and the World Health Organization ("WHO") have declared these Toxic Heavy Metals dangerous to human health. Specifically, FDA states that these Toxic Heavy Metals have "no established health benefit," "lead to illness, impairment, and in high doses, death," and because of bioaccumulation, "even low levels of harmful metals from individual food sources, can sometimes add up to a level of concern."[1]

---

[1] FDA, *Metals and Your Food*, available at: https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food.

27.    The dangerous effects of these toxins are exacerbated and can be indelible in developing and vulnerable bodies and brains of babies and children, who FDA explains are at the greatest risk of harm. *See* Subcommittee Report, p. 2. Exposure, such as ingestion, of Toxic Heavy Metals by babies and children leads to untreatable and permanent brain damage, resulting in reduced intelligence and behavioral problems. For instance, scientific studies have connected exposure to lead to a substantial decrease in children's total IQ points and their lifetime earning capacity. *See* Subcommittee Report, p. 9.

28.    "Exposure to toxic heavy metals [such as arsenic, lead, cadmium, and mercury] causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior in children. Toxic heavy metals endanger infant neurological development and long-term brain function." *See*, Subcommittee Report, p. 2.

29.    Because Toxic Heavy Metals have no benefits and severe detriments, Healthy Babies Bright Futures, an alliance of nonprofit organizations, scientists, and donors whose work is cited favorably in the Subcommittee Report, has concluded that baby food should have no measurable amount of arsenic, lead, cadmium, or mercury. [2]

30.    Given the risks, and in response to reports alleging high levels of Toxic Heavy Metals in baby food sold in the United States, the House Subcommittee launched an investigation into the presence of Toxic Heavy Metals in certain brands of baby food, including Defendant's baby food. *See*, Subcommittee Report, p. 2. The results of the House Subcommittee's investigation were set forth in the Subcommittee Report, which was released on February 4, 2021.

---

[2] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019), at 12 (online www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

*Arsenic in Defendant's Baby Food*

31.    According to the Subcommittee Report, arsenic was present in all brands of baby food responding to the House Subcommittee's investigation.  HappyBABY Brand Baby Food were sold typically containing 60 ppb arsenic and over 25% of the finished products contained more than 100 ppb arsenic and as much as 180 ppb arsenic.

32.    The levels of toxic arsenic in Defendant's baby food far exceeded the 10 ppb limit the FDA has set for arsenic in bottled water that is legal to sell to any consumer, even full grown adults.  *See*, Subcommittee Report, p. 4.

33.    Arsenic is the most dangerous of the Toxic Heavy Metals at issue and poses the most significant risk to human health.  *See*, Subcommittee Report, p. 10. Currently known risks of arsenic to health include respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[3]

34.    One study found negative effects in cognitive development of schoolchildren exposed to concentrations of arsenic over 5 ppb. For the authors of the study, 5 ppb was an important threshold for small children.[4] Consumer reports has recommended setting the limit of arsenic at 3 ppb.

35.    Nurture regularly tests finished products for Toxic Heavy Metals. Nurture sold 30 finished HappyBABY Brand Baby Food products containing more than 100 ppb arsenic. More than 25% of Nurture's HappyBABY Brand Baby Food products that were tested for arsenic

---

[3] Agency for Toxic Substances and Disease Registry, *ATSDR's Substance Priority List* (2019), available at http://www.atsdr.cdc.gov/spl/index.html#2019spl.
[4] Miguel Rodríguez-Barranco et al., Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/).

exceeded 100 ppb arsenic, and nearly 60 ppb arsenic was the average for its products. These products include: Apple & Broccoli Puffs, Banana & Pumpkin Puffs, Strawberry & Beet Puffs, Kale & Spinach Puffs, Purple Carrot & Blueberry Puffs, Sweet Potato & Carrot Puffs, Apple Rice Cakes, and Blueberry Beet Rice Cakes.

### *Lead in Defendant's Baby Food*

36.     Lead was also present in Defendant's baby food. Nurture tested and then sold HappyBABY Brand Baby Food products with as much as 641 ppb lead, and 20% of all finished HappyBABY Brand Baby Food products contained greater than 10 ppb lead.

37.     For comparison, the FDA has set the maximum level of lead in bottled water at 5 ppb. *See*, Subcommittee Report, p. 4.

38.     Lead is the second most dangerous of the Toxic Heavy Metals discussed in the Subcommittee Report. Because lead can accumulate in the body, even small doses of lead have deleterious effects on children, including health, behavioral, cognitive, and development issues. The FDA states that "[h]igh levels of lead exposure can seriously harm children's health and development, specifically the brain and nervous system."[5] There is a growing consensus that lead levels in baby food should not exceed 1 ppb. Healthy Babies Bright Futures concludes that no measurable amount of lead should be in baby food.

39.     At least two studies have established a significant association between early childhood exposure to lead and decreased standardized test scores, academic achievement, and diseases such as attention-deficit/hyperactivity disorder ("ADHD"). These effects last into adulthood according to other studies.[6]

---

[5] FDA, *Metals and Your Food*, available at: https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food.
[6] Nanhua Zhang et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence From Detroit Public Schools*, available at: http://mediad.publicbroadcasting.net/p/michigan/files/201302/AJPH.2012.pdf; Anne Evens *et*

40.     Nurture sold HappyBABY Brand Baby Food finished products laced with as much as 641 ppb lead, over six times higher than its own internal standard, which itself is excessively high. Five HappyBABY Brand Baby Food products were sold with 50 ppb lead. None of Nurture's HappyBABY Brand Baby Food products showed acceptable levels of lead: 39 finished products contained more than 10 ppb lead, and 16 products had more than 20 ppb lead. *See*, Subcommittee Report, p. 23. The 39 products containing more than 10 ppb lead include: Blueberry Purple Carrot Greek Yogis (641 ppb lead), Multi-Grain Cereal Canister (580 ppb lead), Apple Broccoli Puffs (11 ppb lead), Apple Kiwi Spinach Creamies (86 ppb lead), Blueberry Beet Rice Cakes (61 ppb lead), Pea Spinach Teether (55 ppb lead), Apple Spinach Pea & Kiwi Creamies (43 ppb lead), Blueberry Purple Carrot Teether (15 ppb lead), Strawberry Raspberry Carrot Creamies (13 ppb lead), Banana & Pumpkin Puffs (13 ppb lead), Banana Sweet Potato Teether (12 ppb lead), Kale & Spinach Puffs (11 ppb lead), Purple Carrot & Blueberry Puffs (11 ppb lead).

### *Cadmium in Defendant's Baby Food*

41.     Cadmium was another Toxic Heavy Metal found to be present in all brands of baby food subject to the House Subcommittee's investigation.  *See*, Subcommittee Report, p. 3.  Sixty-five percent of HappyBABY Brand Baby Food finished products contained more than 5 ppb cadmium. *See*, Subcommittee Report, p. 3–4.

42.     For comparison, the FDA has set the maximum level of cadmium in bottled water at 5 ppb.  *See*, Subcommittee Report, p. 4.

---

*al*., *The Impact of Low-Level Lead Toxicity on School Performance Among Children in the Chicago Public Schools: A Population-Based Retrospective Cohort Study*, available at: https://ehjournal.biomedcentral.com/articles/10.1186/s12940-015-0008-9; Maitreyi Mazumdar *et al.*, *Low-Level Environmental Lead Exposure in Childhood and Adult Intellectual Function: A Follow-Up Study*, available at: www.ncbi.nlm.nih.gov/pmc/articles/PMC3072933/.

43.    Cadmium is the seventh most dangerous heavy metal toxin according to the ATSDR. Exposure to cadmium is linked with decreases in IQ and development of ADHD. The EPA and FDA set the limit at 5 ppb of cadmium in drinking water and bottled water. The WHO limits cadmium in drinking water at 3 ppb. Certain experts recommend an upper limit of 1 ppb of cadmium in fruit juices.

44.    Nurture's multi-grain cereal was sold with cadmium levels at nearly 50 ppb cadmium. One hundred twenty-five HappyBABY Brand Baby Food products tested by Nurture and later sold registered over 5 ppb cadmium, which exceeds the limit for cadmium in drinking water allowed by EPA. *See*, Subcommittee Report, p. 31.

### Mercury in Defendant's Baby Food

45.    Nurture sold finished HappyBABY Brand Baby Food products to consumers that its own testing showed contained 10 ppb mercury. Fifty-six products tested and later sold contained more than 2 ppb mercury, which exceeds the highest level of mercury that the EPA allows in drinking water.

### Defendant's Baby Food

46.    Defendant manufactures, distributes, advertises, markets, and sells brands of baby food evaluated in the Subcommittee Report. Nurture manufactures, distributes, advertises, markets, and sells HappyBABY Brand Baby Food.

47.    Defendant directs, controls, and participates in the manufacturing and packaging of the baby food products that it sells. As part of that direction, control, and participation, Defendant determines and is responsible for the ingredients used in its baby food.

48.    Defendant knows and is responsible for the ingredients in the baby food products that it sells.

49.     Defendant created, developed, reviewed, authorized, and is responsible for the textual and graphic content on the packaging of the baby food products that it sells.  HappyBABY Brand Baby Food products contain the HappyBABY trademark, which is owned by Nurture.

50.     Each package of HappyBABY Brand Baby Food contains standardized labeling created, developed, reviewed, and authorized by Nurture. The packaging of all types of HappyBABY Brand Baby Food is the same or substantially similar.

51.     Defendant knew, created, developed, reviewed and is responsible for the representations contained on each package of baby food that it sells.

52.     The labels on many varieties of HappyBABY Brand Baby Food—including some of those that Plaintiffs and Class members purchased—tout those products as being free of GMO—which stands for "genetically modified organism"—ingredients. Like BPA, GMOs are also believed to be associated with health risks, "including infertility, immune problems, accelerated aging, faulty insulin regulation and changes in major organs and the gastrointestinal system."[7]  As such, these varieties of HappyBABY Brand Baby Food are marketed as *lacking* a dangerous substance that can negatively affect consumers of the product.

53.     Despite touting the lack of certain dangerous substances in its baby food, Defendant fails to disclose elevated levels of Toxic Heavy Metals on the labels of Defendant's baby food products.

54.     While Defendant's omissions regarding the material fact that its baby food products contain elevated levels of Toxic Heavy Metals are legally significant on their own, Defendant's representations regarding the presence of "iron to help support learning ability" and the lack of BPA and GMOs are also significant.  Although these representations may be true, "a statement that

---

[7] CNN, *10 Ways to Keep Your Diet GMO-Free*, available at: https://www.cnn.com/2014/03/25/health/upwave-gmo-free-diet/index.html.

is technically true may nevertheless be fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading than an outright lie." *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 2015 IL App (2d) 140952, ¶ 33 (citing cases); *see also Heider v. Leewards Creative Crafts, Inc.*, 245 Ill.App.3d 258, 265 (2nd Dist. 1993) ("A statement which is technically true as far as it goes may nonetheless be fraudulent if it is misleading because it does not state matters which materially qualify that statement."); W. Prosser, Law of Torts § 106, at 696 (4th ed. 1971) ("half the truth may obviously amount to a lie, if it is understood to be the whole.").

55.    For example, in representing that Defendant's baby food products lack BPA and GMOs, Defendant represents that its baby food products lack substances that consumers would consider to be deleterious to human health. This is, however, only a "half-truth" as Defendant's baby food products do, in fact, contain deleterious substances—*i.e.*, Toxic Heavy Metals.

### *Consumer Expectations Regarding Baby Food*

56.    Parents' instinctive desire to protect and ensure the healthy development of their children is well-known. As such, the safety of baby food is of paramount importance, and is a material fact, to consumers (such as Plaintiffs and Class members).

57.    More specifically, given the negative effects of Toxic Heavy Metals (such as arsenic, lead, cadmium, and mercury) on child development, the presence of these substances in baby food is a material fact to consumers (such as Plaintiffs and members of the Class). Indeed, consumers—such as Plaintiffs and members of the Class—are unwilling to purchase baby food that contains elevated levels of Toxic Heavy Metals.

58.    Defendant knows that the safety of its brand of baby food (as a general matter) is a material fact to consumers. This is exemplified by the fact that Defendant's baby food products

are marketed and labeled as *lacking* certain substances (*e.g.*, BPA, GMOs) that consumers believe would be deleterious to the health of children.

59.    Defendant also knows that consumers (such as Plaintiffs and members of the Class) are unwilling to purchase its baby food products that contain elevated levels of Toxic Heavy Metals.

60.    As such, Defendant also knows that the presence of Toxic Heavy Metals in its baby food products is a material fact to consumers (such as Plaintiffs and Class members).

61.    Baby food manufacturers (such as Defendant) hold a special position of public trust. Consumers believe that they would not sell products that are unsafe to their infants. *See*, Subcommittee Report, p. 6.

62.    Defendant knew that if the elevated levels of Toxic Heavy Metals in its baby food products was disclosed to Plaintiffs and Class members, then Plaintiffs and Class members would be unwilling to purchase Defendant's Baby Food.

63.    In light of Defendant's knowledge that Plaintiffs and Class members would be unwilling to purchase baby food if they knew that its baby food products contained elevated levels of Toxic Heavy Metals, Defendant intentionally and knowingly concealed this fact from Plaintiffs and Class members, and did not disclose the presence of these Toxic Heavy Metals on the labels of Defendant's baby food products.

64.    Defendant knew that Plaintiffs and Class members would rely upon the representations and omissions contained on the packages of Defendant's baby food products, and intended for them to do so.

65.    Defendant knew that in relying upon the representations and omissions contained on the packages of Defendant's baby food products, Plaintiffs and Class members would view

those products as being safe for consumption, given their represented lack of certain deleterious substances (*e.g.*, BPA, GMOs), and Defendant's concealment of the fact that baby food products contained elevated levels of Toxic Heavy Metals.

66.    Prior to purchasing Defendant's baby food products, Plaintiffs and Class members were exposed to, saw, read, and understood Defendant's representations and omissions regarding the safety of its baby food, and relied upon them.

67.    As a result of Defendant's representations regarding the safety of its baby food, and the lack of certain deleterious substances (*e.g.*, BPA, GMOs), and Defendant's concealment of the fact that its brand of baby food contained elevated levels of Toxic Heavy Metals, Plaintiffs and Class members reasonably believed that Defendant's baby food products were free from substances that would negatively affect children's development.

68.    In reliance upon Defendant's representations and omissions, Plaintiffs and Class members purchased Defendant's baby food products.

69.    Had Plaintiffs and Class members known the truth—*i.e.*, that Defendant's brand of baby food contained elevated levels of Toxic Heavy Metals, rendering it unsafe for consumption by children—they would not have been willing to purchase it at all.

70.    Therefore, as a direct and proximate result of Defendant's misrepresentations and omissions concerning its brand of baby food, Plaintiffs and Class members purchased Defendant's baby food products.

71.    Plaintiffs and Class members were harmed in the form of the money they paid for Defendant's baby food products which they would not otherwise have paid had they known the truth.  Since the presence of elevated levels of Toxic Heavy Metals in baby food renders it unsafe

for human consumption, the Defendant's baby food products that Plaintiffs and Class members purchased is worthless.

***Plaintiff Edelin Altuve Purchased Defendant's Contaminated Baby Food***

72.    On numerous occasions between March 2020 and February 2021, Altuve purchased several different varieties of HappyBABY Brand Baby Food in North Dakota and Florida. Many of the varieties of HappyBABY Brand Baby Food that Altuve purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

> a.    HappyBABY Brand Baby Food from Nurture, including Superfood Puffs Organic Grain Snack Purple Carrot & Blueberry, and Superfood Puffs Sweet Potato & Carrot containing excessive levels of one or more Toxic Heavy Metals.

***Plaintiff Brandy Daniels Purchased Defendant's Contaminated Baby Food***

73.    On numerous occasions in 2020, Daniels purchased several different varieties of HappyBABY Brand Baby Food in North Carolina. Many of the varieties of HappyBABY Brand Baby Food that Daniels purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

> a.    Happy BABY Brand Baby Food, including Apples & Spinach Jar, Bananas & Strawberries Jar, Pears Mangos & Spinach Jar, and Pears & Kale Jar, with excessive levels of one or more Toxic Heavy Metals.

***Plaintiff Diego Galeana Purchased Defendant's Contaminated Baby Food***

74.    On numerous occasions in 2020 and 2021, Galeana purchased several different varieties of HappyBABY Brand Baby Food in Illinois. Many of the varieties of HappyBABY Brand Baby Food that Galeana purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.    HappyBABY Brand Baby Food from Nurture containing excessive levels of one or more Toxic Heavy Metals, including Blueberry Purple Carrot Teethers.

**Plaintiff April Gillens Purchased Defendant's Contaminated Baby Food**

75.    On numerous occasions between September 2020 and February 2021, Gillens purchased several different varieties of HappyBABY Brand Baby Food in Washington, D.C. Many of the varieties of HappyBABY Brand Baby Food that Gillens purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.    HappyBABY Brand Baby Food from Nurture, including Pears Mangoes & Spinach with excessive levels of one or more Toxic Heavy Metals.

**Plaintiff Jandrea Glenn Purchased Defendant's Contaminated Baby Food**

76.    On numerous occasions between December 2020 and February 4, 2021, Glenn purchased several different varieties of HappyBABY Brand Baby Food in Colorado. Many of the varieties of HappyBABY Brand Baby Food that Glenn purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.    HappyBABY Brand Baby Food from Nurture with excessive levels of Toxic Heavy Metals, including Organic Green Bean Puree.

**Plaintiff Elizabeth Hall Purchased Defendant's Contaminated Baby Food**

77.    On numerous occasions between 2019 and 2021, Hall purchased HappyBABY Brand Baby Food in New Hampshire. Many of the varieties of HappyBABY Brand Baby Food that Hall purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.    HappyBABY Brand Baby Food from Nurture containing excessive levels of one or more Toxic Heavy Metals, including Organic Greek Yogis

15

Blueberry & Purple Carrot, Superfood Puffs Kale & Spinach Organic Grain Snack, Purple Carrot & Blueberry Superfood Puffs Organic Grain Snack, Strawberry & Beet Superfood Puffs Organic Grain Snack, Sweet Potato, Apple Broccoli Superfood Puffs Organic Grain Snack, and Carrot Superfood Puffs Organic Grain Snack.

### Plaintiff Savanna Jarrell Purchased Defendant's Contaminated Baby Food

78. On numerous occasions between January 2015 and December 2020, Jarrell purchased HappyBABY Brand Baby Food in Kentucky. Many of the varieties of HappyBABY Brand Baby Food that Jarrell purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a. HappyBABY Brand Baby Food from Nurture containing excessive levels of one or more Toxic Heavy Metals, including HappyBABY Apples Sweet Potatoes & Granola Organic Baby Food, Apples Guavas & Beets Organic Baby Food, and Apples Blueberries & Oats Stage 2 Baby Food Pouch.

### Plaintiff Laszlo Kovacs Purchased Defendant's Contaminated Baby Food

79. On numerous occasions between 2015 and 2021, Kovacs purchased HappyBABY Brand Baby Food in Tennessee. Many of the varieties of HappyBABY Brand Baby Food that Kovacs purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a. HappyBABY Brand Baby Food from Nurture containing excessive levels of one or more Toxic Heavy Metals, including Organic Teether Crackers Strawberry & Beet, Sweet Potato & Carrot Superfood Puffs, and Oats & Quinoa Baby Cereal.

### Plaintiff Cori Lau Purchased Defendant's Contaminated Baby Food

80. On numerous occasions in 2019 and 2020, Lau purchased several different varieties of HappyBABY Brand Baby Food in Nevada. Many varieties of HappyBABY Brand Baby Food that Lau purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

16

    a.    HappyBABY Brand Baby Food from Nurture containing excessive levels of one or more Toxic Heavy Metals, including Gentle Teethers Organic Teething Wafers Blueberry & Purple Carrot, Gentle Teethers Organic Teething Wafers, Pea & Spinach, and Gentle Teethers Organic Teething Wafers, Mango & Pumpkin.

**_Plaintiff Michelle Lyles Purchased Defendant's Contaminated Baby Food_**

81.    On numerous occasions between March 2020 and February 2021, Lyles purchased several different varieties of HappyBABY Brand Baby Food in Maryland. Many of the varieties of HappyBABY Brand Baby Food that Lyles purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    HappyBABY Brand Baby Food from Nurture containing excessive levels of one or more Toxic Heavy Metals, including Superfood Puffs Organic Grain Snack Strawberry & Beet.

**_Plaintiff Christina Martinson Purchased Defendant's Contaminated Baby Food_**

82.    On numerous occasions from approximately August 2020 to January 2021, Martinson purchased several different varieties of HappyBABY Brand Baby Food in Georgia. Many of the varieties of HappyBABY Brand Baby Food that Martinson purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    HappyBABY Brand Baby Food from Nurture containing excessive levels of Toxic Heavy Metals, including Apples Pumpkins & Carrots Puree, Apples Guava & Beets Puree, and Bananas Raspberries & Oats Puree.

**_Plaintiff Melissa Mejia Purchased Defendant's Contaminated Baby Food_**

83.    On many occasions in 2019-2020, Mejia purchased several different varieties of HappyBABY Brand Baby Food in North Carolina. Many of the varieties of HappyBABY Brand Baby Food that Mejia purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a. HappyBABY Brand Baby Food from Nurture containing excessive levels of Toxic Heavy Metals, including Apple Spinach Pea & Kiwi Organic Creamies, Pea & Spinach Organic Teethers, and Sweet Potato & Banana Organic Teethers.

***Plaintiff Chey'na Micciche Purchased Defendant's Contaminated Baby Food***

84.    On numerous occasions between 2016 and 2018, Micciche purchased several different varieties of HappyBABY Brand Baby Food in California. Many of the varieties of HappyBABY Brand Baby Food that Micciche purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a. HappyBABY Brand Baby Food from Nurture containing excessive levels of Toxic Heavy Metals, including Apple Blueberry Oats, Broccoli Pear Peas, and Pears Kale, & Spinach.

***Plaintiff Julia Milton Purchased Defendant's Contaminated Baby Food***

85.    On many occasions between June 2020 and February 2021, Milton purchased several different varieties of HappyBABY Brand Baby Food in Michigan. Many of the varieties of HappyBABY Brand Baby Food that Milton purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a. HappyBABY Brand Baby Food from Nurture containing excessive levels of Toxic Heavy Metals, including Organic Greek Yogis Blueberries & Purple Carrot, and Organic Creamies Strawberry Raspberry and Carrot.

***Plaintiff Michael Morrow Purchased Defendant's Contaminated Baby Food***

86.    On numerous occasions in 2020 and 2021, Morrow purchased several different varieties of HappyBABY Brand Baby Food in California. Many of the varieties of HappyBABY Brand Baby Food that Morrow purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a. HappyBABY Brand Baby Food from Nurture containing excessive levels of one or more Toxic Heavy Metals, including Bananas Raspberries & Oats Organic Baby Food.

***Plaintiff Stacy Musto Purchased Defendant's Contaminated Baby Food***

87.     On numerous occasions in 2019-2020, Musto purchased several different varieties of HappyBABY Brand Baby Food in Missouri. Many of the varieties of HappyBABY Brand Baby Food that Musto purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

        a.     HappyBABY Brand Baby Food from Nurture containing excessive levels of one or more Toxic Heavy Metals, including Organic Vegetable & Beef Medley with Quinoa.

***Plaintiff Gladys Okolo Purchased Defendant's Contaminated Baby Food***

88.     On numerous occasions between July 2020 and January 2021, Okolo purchased several different varieties of HappyBABY Brand Baby Food in Virginia. Many of the varieties of HappyBABY Brand Baby Food that Okolo purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

        a.     HappyBABY Brand Baby Food from Nurture containing excessive levels of one or more Toxic Heavy Metals, including Teethers.

***Plaintiff Lidia Tilahun Purchased Defendant's Contaminated Baby Food***

89.     On numerous occasions between 2019 and 2020, Tilahun purchased several varieties of HappyBABY Brand Baby Food in California. Many of the varieties of HappyBABY Brand Baby Food that Tilahun purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

        a.     HappyBABY Brand Baby Food from Nurture containing excessive levels of one or more Toxic Heavy Metals, including Superfood Puffs Strawberry & Beet.

***Facts Relating to All Plaintiffs and Class Members***

90.     Prior to purchasing HappyBABY Brand Baby Food in retail stores and/or while

19

shopping online, Plaintiffs and Class members were exposed to, saw, read, and understood Defendant's representations and omissions regarding the safety of its baby food, as well as the presence of elevated levels of Toxic Heavy Metals therein, and Plaintiffs and Class members relied upon them.

91.    Plaintiffs and Class members were only willing to purchase HappyBABY Brand Baby Food because they believed that the baby food did *not* contain elevated levels of Toxic Heavy Metals. Defendant advertises, markets, promotes, and sells food products specifically directed to babies and children, and conveys to consumers that its food is wholesome and is designed to meet the unique nutritional and developmental needs of growing children. Plaintiffs' and Class members' belief that Defendant's baby food products were healthy and thus did not contain deleterious and toxic substances in unreasonable and excessive levels is bolstered by Defendant's representations regarding the presence of iron, representations of natural ingredients, representations that its products are organic, and the *lack* of BPA and GMOs in its brand of baby food.

92.    In reliance upon Defendant's representations and omissions, Plaintiffs and Class members purchased HappyBABY Brand Baby Food.

93.    Had Plaintiffs and Class members known the truth regarding the excessive levels of Toxic Heavy Metals in Defendant's baby food products, they would not have purchased them.

94.    The presence of Toxic Heavy Metals at the levels found in the Subcommittee Report in HappyBABY Brand Baby Food renders the baby food that Plaintiffs and Class members purchased worthless, unsafe for human consumption, and to an even greater extent not suited for consumption by the most vulnerable humans.

95.     Therefore, as a direct and proximate result of Defendant's misrepresentations and omissions concerning its brand of baby food, Plaintiffs and Class members suffered injury in fact in the form of the money they paid for HappyBABY Brand Baby Food—money they would not otherwise have paid to Defendant had they known the truth.

96.     Plaintiffs bring this action on behalf of themselves, and Classes of similarly situated individuals, seeking recovery of damages, including actual damages, enhanced, statutory, and punitive damages, as well as equitable relief, including restitution, disgorgement, and injunctive relief, reasonable attorneys' fees and costs, as allowed under the various causes of action set forth herein.

97.     Plaintiffs are likely to consider purchasing baby food products in the future provided that Defendant institutes corrective measures and cures its unfair and deceptive acts and practices. Should Defendant provide clear and non-misleading disclosures regarding the levels of Toxic Heavy Metals in its baby food, improve its sourcing of ingredients and manufacturing processes, and accurately and effectively test final products of its baby food for excessive levels of Toxic Heavy Metals, Plaintiffs would likely purchase baby food products from Defendant if they are truthfully labeled and do not contain excessive levels of Toxic Heavy Metals or other deleterious substances material to a parent or guardian's decision to purchase and feed food to their vulnerable and developing babies and children.

98.     Defendant is equitably estopped from asserting defenses relating to statutes of limitations. Not only did Defendant fail to disclose the elevated levels of Toxic Heavy Metals in its baby food, but Defendant also touted its brand of baby food as wholesome, natural, specially prepared to meet nutritional and developmental needs of babies and children, and lacking certain undesired substances, such as BPA and GMOs, and including certain beneficial substances, such

as iron. In addition, Defendant concealed facts regarding the presence of Toxic Heavy Metals in its baby food by purposefully refusing to test the final products and relying upon flawed theoretical models to erroneously claim the levels of Toxic Heavy Metals in its finished products do not exceed Defendant's unreasonably high internal limits. Defendant also omitted and concealed the facts regarding the presence of Toxic Heavy Metals from the FDA and Congress. Finally, Defendant learned of the excessive levels of Toxic Heavy Metals in its baby food products through its own internal testing, and it knew about the excessive levels of Toxic Heavy Metals in its competitors' baby food products, yet it failed and refused to disclose that its competitors' products were unsafe for human consumption because all of its products were similarly unsafe for human consumption. As such, Defendant actively and fraudulently concealed the true nature of the baby food.

## CLASS ALLEGATIONS

99.     **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a nationwide class of similarly situated individuals and entities ("the Class"), defined as follows:

> All persons in the United States who purchased HappyBABY Brand Baby Food.

100.     **California Subclass Definition:** Tilahun, Micciche, and Morrow bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("California Subclass"), defined as follows:

> All persons in California who purchased HappyBABY Brand Baby Food.

101.     **Colorado Subclass Definition:** Glenn brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Colorado Subclass"), defined as follows:

All persons in Colorado who purchased HappyBABY Brand Baby Food.

102.    **Florida Subclass Definition:** Altuve brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Florida Subclass"), defined as follows:

All persons in Florida who purchased HappyBABY Brand Baby Food.

103.    **Georgia Subclass Definition**: Martinson brings this action pursuant to Fed. R. Civ. P. 23, on behalf of similarly situated individuals and entities ("Georgia Subclass"), defined as follows:

All persons in Georgia who purchased HappyBABY Brand Baby Food.

104.    **Illinois Subclass Definition:** Galeana brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Illinois Subclass"), defined as follows:

All persons in Illinois who purchased HappyBABY Brand Baby Food.

105.    **Kentucky Subclass Definition:** Jarrell brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Kentucky Subclass"), defined as follows:

All persons in Kentucky who purchased HappyBABY Brand Baby Food.

106.    **Maryland Subclass Definition:** Lyles brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Maryland Subclass"), defined as follows:

All persons in Maryland who purchased HappyBABY Brand Baby Food.

107.    **Michigan Subclass Definition**: Milton brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("Michigan Subclass"),

defined as follows:

> All persons in Michigan who purchased HappyBABY Brand Baby Food.

108.    **Missouri Subclass Definition**: Musto brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("Missouri Subclass"), defined as follows:

> All persons in Missouri who purchased HappyBABY Brand Baby Food.

109.    **Nevada Subclass Definition:** Lau brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Nevada Subclass"), defined as follows:

> All persons in Nevada who purchased HappyBABY Brand Baby Food.

110.    **New Hampshire Subclass Definition:** Hall brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("New Hampshire Subclass"), defined as follows:

> All persons in New Hampshire who purchased HappyBABY Brand Baby Food.

111.    **North Carolina Subclass Definition**: Daniels and Mejia bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("North Carolina Subclass"), defined as follows:

> All persons in North Carolina who purchased HappyBABY Brand Baby Food.

112.    **North Dakota Subclass Definition:** Altuve brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("North Dakota Subclass"), defined as follows:

> All persons in North Dakota who purchased HappyBABY Brand Baby Food.

24

113.    **Tennessee Subclass Definition**: Kovacs brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Tennessee Subclass"), defined as follows:

> All persons in Tennessee who purchased HappyBABY Brand Baby Food.

114.    **Virginia Subclass Definition**: Okolo brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Virginia Subclass"), defined as follows:

> All persons in Virginia who purchased HappyBABY Brand Baby Food.

115.    **Washington D.C. Subclass Definition**: Gillens brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Washington D.C. Subclass"), defined as follows:

> All persons in Washington D.C. who purchased HappyBABY Brand Baby Food.

116.    Excluded from the Class and Subclasses are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class and Subclass(es); (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

117.    **Numerosity**: The Class and Subclasses are each so numerous that joinder of individual members would be impracticable. While the exact number of Class members and Subclass members is presently unknown and can only be ascertained through discovery, Plaintiff

believes that there are thousands of Class and Subclass members, if not more, as Defendant is one

of the seven largest manufacturers of baby food in the United States. *See*, Subcommittee Report,

p. 2.

118.     **Commonality and Predominance**: There are several questions of law and fact

common to the claims of the Plaintiffs and members of the Classes, which predominate over any

individual issues, including:

a.     Whether the HappyBABY Brand Baby Food contains unsafe levels of Toxic Heavy Metals;

b.     Whether Defendant misrepresented to Plaintiffs and Class members that HappyBABY Brand Baby Food was safe for human consumption and did not contain elevated levels of Toxic Heavy Metals;

c.     Whether Defendant omitted and concealed the levels of Toxic Heavy Metals in HappyBABY Brand Baby Food;

d.     Whether the presence of elevated levels of Toxic Heavy Metals in HappyBABY Brand Baby Food is a material fact to Plaintiffs and Class members;

e.     The extent and amount of Plaintiffs' and Class members' damages;

f.     Whether Defendant's conduct constitutes unlawful acts or practices under each of the state consumer protection and unfair or deceptive practices statutes asserted herein;

g.     Whether Defendant's conduct constitutes fraudulent concealment;

h.     Whether Defendant was unjustly enriched by their improper conduct;

i.     Whether Plaintiffs and Class members are entitled to injunctive relief to (1) require Defendant to cease its unlawful and deceptive practices; (2) to implement and maintain adequate manufacturing procedures, final product testing procedures, and ingredient sourcing and inspection practices to ensure its baby food does not contain unsafe and unacceptable levels of heavy metals; and (3) impose clear and prominent disclosure requirements on its product packaging regarding the levels of Toxic Heavy Metals in its finished products; and

j.     Whether Defendant's conduct resulted in Defendant unjustly retaining a benefit to the detriment of Plaintiffs and Class members, and violated the fundamental principles of justice, equity, and good conscience.

26

119.    **Typicality**: Plaintiffs' claims are typical of the claims of the proposed Classes. All claims are based on the same legal and factual issues regarding Defendant's misrepresentations and omissions concerning the presence of elevated levels of Toxic Heavy Metals in HappyBABY Brand Baby Food.

120.    **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the proposed Classes, and Plaintiffs do not have any interests antagonistic to those of the proposed Classes.  Plaintiffs have retained competent counsel experienced in the prosecution of this type of litigation.

121.    **Superiority**: A class action can best secure the economies of time, effort and expense, and promote uniformity. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually. Individual actions are not feasible and it is unlikely that individual members of the Class will prosecute separate actions. The trial and the litigation of Plaintiffs' claims as a class action will be manageable.

## COUNT 1
**(On Behalf of Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass)**
**Violation of California Business & Professions Code §§ 17200, *et seq*.**
**for Engaging in Unlawful, Unfair, and Deceptive Business Acts or Practices**

122.    Plaintiffs Micciche, Morrow, and Tilahun repeat paragraphs 1–121 as if fully set forth herein.

123.    California Business & Professions Code section 17200 (California's Unfair Competition Law) prohibits "unlawful," "unfair," or "fraudulent" business acts or practices and any false or misleading advertising.

124.    California Business & Professions Code section 17203 provides in pertinent part:

Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure . . .

125.    As alleged above, Defendant has engaged and continues to unlawfully engage in fraudulent, unfair, and unlawful business practices by making false representations and omissions of material fact regarding its brand of baby food, including the misrepresentations that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

126.    In the course of conducting business, Defendant committed unfair business practices by, among other things, misrepresenting and omitting material facts regarding the characteristic, benefits, and ingredients of its baby food products.

127.    Defendant knew of, or was willfully blind to, the excessive levels of Toxic Heavy Metals in its baby food products that it manufactured, packaged, marketed, distributed, and sold to Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass, as Defendant's internal testing showed the excessive levels of Toxic Heavy Metals in the products.

128.    In the course of conducting business, Defendant committed unlawful acts and practices by, among other things, selling to Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass members baby food products that were misbranded and adulterated under the Food, Drug, and Cosmetic Act, 21 U.S.C. §331, and California Health and Safety Code §110545, because they were, bear, or contain non-naturally occurring and/or excessive levels of poisonous and deleterious substances that render them injurious to health of the baby and children who were

28

the intended consumers of the baby food products, and under California Health and Safety Code §110555, because they bear and contain food additives that are unsafe. *See* Cal. Health & Safety Code §§ 110625, 110630.

129.    In the course of conducting business, Defendant committed fraudulent acts or practices in violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17203.

130.    In the course of conducting business, Defendant committed fraudulent acts and practices by, among other things, making the aforementioned misrepresentations, omissions, and concealment that possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

131.    Defendant intended that Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members rely on its false statements, misrepresentations, omissions, and concealment of material fact in purchasing its baby food products.

132.    Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased its baby food products.

133.    Acting as reasonable consumers, had Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members been aware of the truth regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

134.    Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for HappyBABY Brand Baby Food under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

135.    Acting as reasonable consumers, Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members first purchasing Defendant's baby food products.

136.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent acts or practices, Plaintiffs Micciche, Morrow, Tilahun, and members of the California Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## COUNT 2
**(On Behalf of Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass)**
**Violation of California Consumer Legal Remedies Act, Cal. Civ. Code § 1770,** *et seq.*[8]

137.    Plaintiffs Micciche, Morrow, and Tilahun repeat paragraphs 1–121 as if fully set forth herein.

138.    Defendant are persons under Cal. Civ. Code § 1761(c).

139.    Plaintiffs Micciche, Morrow, and Tilahun are consumers under Cal. Civ. Code § 1761(d) who purchased Defendant's baby food products.

140.    California's Consumer Legal Remedies Act, Cal. Civ. Code §1770, *et seq.* ("CLRA"),

---

[8] Micciche, Morrow, and Tilahun have sent a demand letter to Defendant, and reserve the right to amend their claims to include a claim for damages under the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1770, *et seq.*, should Defendant fail to timely and satisfactorily meet their demands.

prohibits unfair methods of competition and unfair or deceptive acts or practices intended to result in the sale of goods to consumers, including but not limited to:

a. Representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have (§ 1770(a)(5));

b. Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another (§ 1770(a)(7));

c. Advertising goods with intent not to sell them as advertised (§ 1770(a)(9)).

141. Defendant violated the foregoing provisions of the CLRA by selling its baby food products that were unsafe for human consumption, and by omitting that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

142. In the course of conducting business, Defendant committed fraudulent acts and practices by, among other things, making the aforementioned misrepresentations, omissions, and concealment that possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

143. Defendant intended that Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members rely on their false statements, misrepresentations, omissions, and concealment of material fact in purchasing its baby food products.

144. Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased its baby food products.

145. Acting as reasonable consumers, had Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members been aware of the truth regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase the products.

146.    Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

147.    Acting as reasonable consumers, Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members first purchasing Defendant's baby food products.

148.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent acts or practices, Plaintiffs Micciche, Morrow, Tilahun, and members of the California Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

149.    Pursuant to § 1782(d) of the CLRA, Plaintiffs Micciche, Morrow, and Tilahun, individually and on behalf of similarly situated California Subclass members, seek a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to remove its unsafe products from store shelves and recall all of its products containing ingredients that render its baby food unsafe for human consumption, and take other corrective measures, such as corrective labeling and improvement of food manufacturing standards, procedures, and testing.

150.    Plaintiffs Micciche, Morrow, and Tilahun have provided the requisite notice and demand letter to Defendant, and seek monetary damages and all other forms of relief to which they are entitled.

**COUNT 3**
**(On Behalf of Plaintiff Glenn and the Colorado Subclass)**
**Violation of Colorado Consumer Protection Act ("CCPA"),**
**Colo. Rev. Stat. §§6-1-101, *et seq*.**

151.    Plaintiff Glenn repeats paragraphs 1–121 as if fully set forth herein.

152.    Colorado law prohibits the following deceptive trade practices: knowingly or recklessly making a false representation as to the characteristics, ingredients, uses, benefits, alteration, or quantities of goods, food, services, or property (Colo. Rev. Stat. § 6-1-105(e)); representing that goods, food, services, or property are of a particular standard, quality, or grade if he knows or should know that they are of another (Colo. Rev. Stat. § 6-1-105(g)); advertising goods, services, or property with intent not to sell them as advertised (Colo. Rev. Stat. § 6-1-105(i)); failing to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction (Colo. Rev. Stat. § 6-1-105(u)); and knowing or recklessly engaging in unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent practice (Colo. Rev. Stat. § 6-1-105(kkk)).

153.    Plaintiff Glenn and Colorado Subclass members are consumers under the CCPA who purchased Defendant's baby food products.

154.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

33

155.    Defendant's misrepresentations, omissions, and concealment regarding its brand of baby food constitutes deceptive and unconscionable acts or practices prohibited by the CCPA.

156.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

157.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of its brand of baby food to Plaintiff and the Colorado Subclass.

158.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

159.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Colo. Rev. Stat. 25-5-403.

160.    Defendant intended that Plaintiff Glenn and Colorado Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing its baby food products.

161.    Plaintiff Glenn and Colorado Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased its baby food products.

162.    Acting as reasonable consumers, had Plaintiff Glenn and Colorado Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase the products.

163.    Plaintiff Glenn and Colorado Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

34

164.    Acting as reasonable consumers, Plaintiff Glenn and Colorado Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Glenn and Colorado Subclass members first purchasing Defendant's baby food products.

165.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Glenn and members of the Colorado Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

166.    Plaintiff Glenn, individually and on behalf of similarly situated Colorado Subclass members, seeks a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to remove its unsafe products from store shelves and recall all of its products containing ingredients that render its baby food unsafe for human consumption, and take other corrective measures, such as corrective labeling and improvement of food manufacturing standards, procedures, and testing. Plaintiff Glenn and Colorado Subclass members also seek damages, equitable relief, attorney's fees and costs, to the furthest extent allowed under Colorado law.

## COUNT 4
**(On Behalf of Plaintiff Altuve and the Florida Subclass)**
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. § 501.201, *et seq*.**

167.    Plaintiff Altuve repeats paragraphs 1–121 as if fully set forth herein.

168.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA"), provides protection to consumers by mandating fair competition in commercial markets for goods and services.

169.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

170.    The FDUTPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. Fla. Stat. § 501.203(8).

171.    Plaintiff Altuve and each member of the Florida Subclass are "consumers," as defined by Fla. Stat. § 501.203(7).

172.    Defendant's baby food products fall within FDUTPA because they are a "good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value." Fla. Stat. § 501.203(8).

173.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that their brands of baby food were safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

174.    Defendant's misrepresentations, omissions, and concealment regarding its baby food products constitute deceptive and unconscionable acts or practices prohibited by the FDUTPA.

175.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

176.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Altuve and the Florida Subclass.

177.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

178.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Fla. Stat. § 500.11.

179.    Defendant intended that Plaintiff Altuve and Florida Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

180.    Plaintiff Altuve and Florida Subclass members reasonably relied on Defendant's respective misrepresentations, omissions, and concealment when they purchased its baby food products.

181.    Acting as reasonable consumers, had Plaintiff Altuve and Florida Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase the products.

182.    Plaintiff Altuve and Florida Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

183.    Acting as reasonable consumers, Plaintiff Altuve and Florida Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated

levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Altuve and Florida Subclass members first purchasing Defendant's baby food products.

184.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Altuve and members of the Florida Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

185.    Plaintiff Altuve, individually and on behalf of similarly situated Florida Subclass members, seek a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to remove its unsafe products from store shelves and recall all of its products containing ingredients that render its baby food unsafe for human consumption, and take other corrective measures, such as corrective labeling and improvement of food manufacturing standards, procedures, and testing. Plaintiff Altuve and Florida Subclass members also seek damages, equitable relief, attorney's fees and costs, to the furthest extent allowed under Florida law.

**COUNT 5**
**(On Behalf of Plaintiff Martinson and the Georgia Subclass)**
**Violation of Georgia Uniform Deceptive Trade Practices Act ("GUDTPA")**
**O.C.G.A. §§ 10-1-370, *et seq*.**

186.    Plaintiff Martinson repeats paragraphs 1–121 as if fully set forth herein.

187.    Plaintiff Martinson and the Georgia Subclass members are persons within the meaning of § 10-1-371(5) of the GUDTPA.

188.    Defendant engaged in deceptive trade practices in the conduct of its business, in violation of O.C.G.A. § 10-1-372(a), including:

      a.    Representing that goods or services have characteristics that they do not have;

      b.    Representing that goods or services are or a particular standard, quality, or grade if they are of another;

      c.    Advertising goods or services with intent not to sell them as advertised; and

      d.    Engaging in conduct that creates a likelihood of confusion or misunderstanding.

189.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Martinson and Georgia Subclass members.

190.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

191.    Defendant intended that Plaintiff Martinson and Georgia Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

192.    Plaintiff Martinson and Georgia Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

193.    Acting as reasonable consumers, had Plaintiff Martinson and Georgia Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

194.    Plaintiff Martinson and Georgia Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

195.    Acting as reasonable consumers, Plaintiff Martinson and Georgia Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Martinson and Georgia Subclass members first purchasing Defendant's baby food products.

196.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Martinson and Georgia Subclass members suffered damages and ascertainable losses of money and property by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals. Plaintiff Martinson and Georgia Subclass members therefore seek all relief allowed by law, including injunctive relief and reasonable attorneys' fees and costs, under O.C.G.A. § 10-1-373.

**COUNT 6**
**(On Behalf of Plaintiff Martinson and the Georgia Subclass)**
**Violation of Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*.**

197.    Plaintiff Martinson repeats paragraphs 1–121 as if fully set forth herein.

198.    The Fair Business Practices Act protects consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce. O.C.G.A. § 10-1-391(a).

199.    Plaintiff Martinson and Georgia Subclass members are "consumers." O.C.G.A. § 10-1-392(6).

200.    In the course of trade and commerce, Defendant sold its baby food products in consumer transactions. O.C.G.A § 10-1-392(10), (28).

201.    Defendant's false, misleading, and deceptive misrepresentations, and omissions, concealment, and suppression of material facts as described herein constitute the following unfair or deceptive acts and are unlawful: representing that foods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods are of a particular standard, quality, or grade or that goods are of a particular model or style, if they are of another; advertising goods with intent not to sell them as advertised. O.C.G.A. § 10-1-393(b)(5), (7), (9).

202.    Defendant intended that Plaintiff Martinson and Georgia Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

203.    Plaintiff Martinson and Georgia Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

204.    Acting as reasonable consumers, had Plaintiff Martinson and Georgia Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

205.    Plaintiff Martinson and Georgia Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that they were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

206.    Acting as reasonable consumers, Plaintiff Martinson and Georgia Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not readily available to Plaintiff Martinson and Georgia Subclass members at the time they purchased Defendant's baby food products.

207.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Martinson and Georgia Subclass members suffered damages and ascertainable losses of money and property by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

208.    All conditions precedent have occurred or been performed, including the sending of a proper demand letter.

## COUNT 7
### (On Behalf of Plaintiff Galeana and the Illinois Subclass)
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*

209.    Plaintiff Galeana repeats paragraphs 1–121 as if fully set forth herein.

210.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*, provides protection to consumers by mandating fair competition in commercial markets for goods and services.

211.   The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act". 815 ILCS 505/2.

212.   The ICFA applies to Defendant's acts as described herein because it applies to transactions involving the sale of goods or services to consumers.

213.   Defendant is a "person," as defined by 815 ILCS 505/1(c).

214.   Plaintiff Galeana and each member of the Illinois Subclass are "consumers," as defined by 815 ILCS 505/1(e), because they purchased Defendant's baby food products.

215.   Defendant's baby food products are "merchandise," as defined by 815 ILCS 505/1(b).

216.   Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

217.   Defendant's respective misrepresentations and omissions regarding Defendant's baby food products constitute deceptive and unfair acts or practices prohibited by the ICFA.

218.   Defendant's aforementioned misrepresentations and omissions possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

43

219.    Defendant's aforementioned misrepresentations and omissions were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Galeana and the Illinois Subclass.

220.    Defendant's aforementioned misrepresentations and omissions are unfair business practices because they offend public policy and/or cause substantial injury to consumers.

221.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and section 620/11(a) of the Illinois Food, Drug, and Cosmetic Act.

222.    Defendant intended that Plaintiff Galeana and Illinois Subclass members rely on its aforementioned false statements, misrepresentations, and omissions of material fact in purchasing Defendant's baby food products.

223.    Plaintiff Galeana and Illinois Subclass members reasonably relied on Defendant's misrepresentations and omissions when they purchased Defendant's baby food products.

224.    Acting as reasonable consumers, had Plaintiff Galeana and Illinois Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

225.    Plaintiff Galeana and Illinois Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

226.    Acting as reasonable consumers, Plaintiff Galeana and Illinois Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated

levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Galeana and Illinois Subclass members first purchasing Defendant's baby food products.

227.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Galeana and members of the Illinois Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 8**
**(On Behalf of Plaintiff Jarrell and the Kentucky Subclass)**
**Violation of Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.110, *et seq*.**

228.    Plaintiff Jarrell repeats paragraphs 1–121 as if fully set forth herein.

229.    The Kentucky Consumer Protection Act ("KCPA") prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. § 367.170.

230.    The KCPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices are in connection with the sale of consumer goods.

231.    Plaintiff Jarrell and each member of the Kentucky Subclass are persons within the meaning of Ky. Rev. Stat. § 367.220.

232.    Defendant's baby food products fall within KCPA because they are a consumer goods.

233.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the

45

misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

234.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair, abusive, and deceptive acts or practices prohibited by the KCPA.

235.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

236.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Jarrell and the Kentucky Subclass.

237.    Defendant's aforementioned misrepresentations, omissions, and concealment are unfair and abusive because they offend public policy and cause substantial injury to consumers.

238.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Ky. Rev. Stat. §§ 217.025–217.045.

239.    Defendant intended that Plaintiff Jarrell and Kentucky Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material facts in purchasing Defendant's baby food products.

240.    Plaintiff Jarrell and Kentucky Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

241.    Acting as reasonable consumers, had Plaintiff Jarrell and Kentucky Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

242.    Plaintiff Jarrell and Kentucky Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

243.    Acting as reasonable consumers, Plaintiff Jarrell and Kentucky Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff and Kentucky Subclass members first purchasing Defendant's baby food products.

244.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Jarrell and members of the Kentucky Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 9
**(On Behalf of Plaintiff Lyles and the Maryland Subclass)**
**Violation of the Maryland Consumer Protection Act,**
**Md. Code, Comm. Law §§ 13-301, *et seq*. ("MCPA")**

245.    Plaintiff Lyles repeats paragraphs 1–121 as if fully set forth herein.

246.    The Maryland Consumer Protection Act, Md. Code, Comm. Law §§ 13-303, prohibits unfair, abusive, and deceptive practices, including: false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; representations that

consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have; consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not; and a failure to state a material fact if the failure deceives or tends to deceive. Md. Code, Comm. Law §§ 13-301(1), (2)(i), (2)(iv), (3).

247.    The MCPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices were in connection with the sale of consumer goods.

248.    Plaintiff Lyles and each member of the Maryland Subclass are persons within the meaning of Md. Code, Comm. Law § 13-408.

249.    Defendant's baby food products fall within MCPA because they are consumer goods.

250.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

251.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair, abusive, and deceptive acts or practices prohibited by the MCPA.

252.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

253.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Lyles and the Maryland Subclass.

48

254.    Defendant's aforementioned misrepresentations, omissions, and concealment are unfair and abusive because they offend public policy and cause substantial injury to consumers.

255.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Md. Code, Health-Gen. Code §§ 21-207, 21-208, 21-210, 21-247.

256.    Defendant intended that Plaintiff Lyles and Maryland Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material facts in purchasing Defendant's baby food products.

257.    Plaintiff Lyles and Maryland Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

258.    Acting as reasonable consumers, had Plaintiff Lyles and Maryland Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

259.    Plaintiff Lyles and Maryland Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

260.    Acting as reasonable consumers, Plaintiff Lyles and Maryland Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable

49

consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Lyles and Maryland Subclass members first purchasing Defendant's baby food products.

261.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Lyles and members of the Maryland Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 10**
**(On Behalf of Plaintiff Milton and the Michigan Subclass)**
**Violation of the Michigan Consumer Protection Act,**
**Mich. Comp. Laws § 445.901 ("MCPA"),** *et seq*.

262.    Plaintiff Milton repeats paragraphs 1–121 as if fully set forth herein.

263.    The Michigan Consumer Protection Act prohibits any unfair, unconscionable, or deceptive method, act, or practice in the conduct of trade or commerce. Mich. Comp. Law. § 445.903.

264.    Defendant engaged in the following proscribed practices under section 445.903 of the MCPA: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods or services are of a particular standard, quality, or grade, or that foods are of a particular style or model, if they are of another; advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; and failing to reveal facts that are material to the transaction in light or representations of fact made in a positive manner. Mich. Comp. Law § 445.903(1)(c), (e), (h), (s), (cc).

50

265.    The MCPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. Mich. Comp. Law § 445.902(g).

266.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food were safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

267.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the MCPA.

268.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

269.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Milton and the Michigan Subclass.

270.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

271.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Mich. Comp. Law §§ 289.1105(1)(a), 289.1109(p).

272.    Defendant intended that Plaintiff Milton and Michigan Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

51

273.    Plaintiff Milton and Michigan Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

274.    Acting as reasonable consumers, had Plaintiff Milton and Michigan Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

275.    Plaintiff Milton and Michigan Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

276.    Acting as reasonable consumers, Plaintiff Milton and Michigan Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Milton and Michigan Subclass members first purchasing Defendant's baby food products.

277.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Milton and members of the Michigan Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

278.    Plaintiff Milton and the Michigan Subclass seek actual damages, statutory and punitive damages for Defendant's persistent and knowing violations, injunctive and declaratory relief, as well as reasonable attorneys' fees and costs under Mich. Comp. Law § 445.911.

**COUNT 11**
**(On Behalf of Plaintiff Musto and the Missouri Subclass)**
**Violation of the Missouri Merchandising Practices Act ("MMPA"),**
**Mo. Stat. § 407.010, *et seq*.**

279.    Plaintiff Musto repeats paragraphs 1–121 as if fully set forth herein.

280.    The MMPA, Mo. Stat. § 407.010, *et seq*., provides protection to consumers by mandating fair competition in commercial markets for goods and services.

281.    The MMPA prohibits any "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Stat. § 407.020(1).

282.    The MMPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. Mo. Stat. § 407.010(7).

283.    Plaintiff Musto and each member of the Missouri Subclass are "persons," as defined by Mo. Stat. § 407.010(5).

284.    Defendant's baby food products fall within the MMPA because they are tangible goods sold in trade or commerce. Mo. Stat. § 407.010(7).

285.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

286.    Defendant's   misrepresentations,   omissions,   and   concealment   regarding
Defendant's  baby  food  products  constitutes  deceptive  and  unconscionable  acts  or  practices
prohibited by the MMPA.

287.    Defendant's  aforementioned  misrepresentations,  omissions,  and  concealment
possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

288.    Defendant's aforementioned misrepresentations, omissions, and concealment were
used  or  employed  in  the  conduct  of  trade  or  commerce,  namely,  the  marketing,  sale,  and
distribution of Defendant's baby food products to Plaintiff Musto and the Missouri Subclass.

289.    Defendant's  aforementioned  misrepresentations,  omissions,  and  concealment  are
unconscionable because they offend public policy and/or cause substantial injury to consumers.

290.    Defendant's  aforementioned conduct is deceptive and unlawful because it violated
section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Mo. Stat. § 196.075(1).

291.    Defendant intended that Plaintiff Musto and Missouri Subclass members rely on its
aforementioned false statements, misrepresentations, omissions, and concealment of material fact
in purchasing Defendant's baby food products.

292.    Plaintiff Musto and Missouri Subclass members reasonably relied on Defendant's
misrepresentations,  omissions,  and  concealment  when  they  purchased  Defendant's  baby  food
products.

293.    Acting  as  reasonable  consumers,  had  Plaintiff  Musto  and  Missouri  Subclass
members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's
baby food products, they would have declined to purchase these products.

294.    Plaintiff Musto and Missouri Subclass members suffered injuries in fact—*i.e.*, the
loss of the money that they paid for Defendant's baby food products under the belief that these

products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

295.    Acting as reasonable consumers, Plaintiff Musto and Missouri Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Musto and Missouri Subclass members first purchasing Defendant's baby food products.

296.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Musto and members of the Missouri Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## COUNT 12
### (On Behalf of Plaintiff Lau and the Nevada Subclass)
### Violation of the Nevada Deceptive Trade Practices Act,
### Nev. Rev. Stat. § 598.0915 ("NDTPA")

297.    Plaintiff Lau repeats paragraphs 1–121 as if fully set forth herein.

298.    Nevada law prohibits knowingly making false representations as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods or services; representing that goods or services for sale are of a particular standard, quality, or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style, or model; and knowingly making false representations in a transaction. Nev. Rev. Stat. § 598.0915(5), (7), (15).

299.     Nevada provides that victims of unlawful acts under Nev. Rev. Stat. § 598.0915 *et seq*. are entitled to bring an action under Nev. Rev. Stat. § 41.600(1), (2).

300.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

301.     Defendant's respective misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by Nevada law.

302.     Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

303.     Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Lau and the Nevada Subclass.

304.     Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

305.     Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Nev. Rev. Stat. §§ 585.300–585.350.

306.     Defendant intended that Plaintiff Lau and Nevada Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

307.    Plaintiff Lau and Nevada Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

308.    Acting as reasonable consumers, had Plaintiff Lau and Nevada Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

309.    Plaintiff Lau and Nevada Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

310.    Acting as reasonable consumers, Plaintiff Lau and Nevada Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Lau and Nevada Subclass members first purchasing Defendant's baby food products.

311.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Lau and members of the Nevada Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 13**
**(On Behalf of Plaintiff Hall and the New Hampshire Subclass)**
**Violation of New Hampshire Regulation of Business Practices for Consumer Protection,**
**N.H. Rev. Stat. §§ 358-A:1,** *et seq.*

312.    Plaintiff Hall repeats paragraphs 1–121 as if fully set forth herein.

313.    New Hampshire law prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, including but not limited to: representing that foods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model if they are of another, and advertising goods or services with intent not to sell them as advertised. N.H. Rev. Stat. §§ 358-A:2(V), (VII), (IX).

314.    New Hampshire Regulation of Business Practices for Consumer Protection applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. N.H. Rev. Stat. § 358-A:1(II).

315.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

316.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the New Hampshire Regulation of Business Practices for Consumer Protection.

317.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

318.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff and New Hampshire Subclass members.

319.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

320.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and N.H. Rev. Stat. § 146:1, *et seq*.

321.    Defendant intended that Plaintiff and New Hampshire Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

322.    Plaintiff Hall and New Hampshire Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

323.    Acting as reasonable consumers, had Plaintiff Hall and New Hampshire Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

324.    Plaintiff Hall and New Hampshire Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

325.    Acting as reasonable consumers, Plaintiff Hall and New Hampshire Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained

elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Hall and New Hampshire Subclass members first purchasing Defendant's baby food products.

326.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Hall and members of the New Hampshire Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 14
**(On Behalf of Plaintiffs Daniels, Mejia, and the North Carolina Subclass)**
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act,**
**N.C. Gen. Stat. § 75-1.1, *et seq*. ("NCUDTPA")**

327.    Plaintiffs Daniels and Mejia repeat paragraphs 1–121 as if fully set forth herein.

328.    N.C. Gen. Stat. § 75-1.1(a) states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

329.    Defendant's sales of Defendant's baby food products occurred in and affected commerce.

330.    In violation of the NCUDTPA, Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentations that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

331.   Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts or practices.

332.   Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

333.   Defendant's acts and practices in connection with the sale of Defendant's baby food products were unfair because they took advantage of the inability of Plaintiffs Daniels and Mejia and North Carolina Subclass members reasonably to protect their interests in ascertaining the Toxic Heavy Metal quantities of their products at the point of sale; Defendant knew that the price of their products (which are worthless given the excessive levels of Toxic Heavy Metals) were substantially in excess of the price at which they lawfully could be sold; and Defendant knew at the time of the transaction that Plaintiffs Daniels, Mejia, and the North Carolina Subclass members were unable to receive a substantial benefit from their products.

334.   Defendant intended that Plaintiffs Daniels, Mejia, and North Carolina Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

335.   Plaintiffs Daniels, Mejia, and North Carolina Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they Defendant's baby food products.

336.   Acting as reasonable consumers, had Plaintiffs Daniels, Mejia, and North Carolina Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

337.   Plaintiffs Daniels, Mejia, and North Carolina Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the

belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

338.    Acting as reasonable consumers, Plaintiffs Daniels, Mejia, and North Carolina Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Daniels, Mejia, and North Carolina Subclass members first purchasing Defendant's baby food products.

339.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiffs Daniels, Mejia, and members of the North Carolina Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 15
**(On Behalf of Plaintiff Altuve and the North Dakota Subclass)**
**Violation of the North Dakota Unlawful Sales or Advertising Practices,**
**N.D.C.C. § 51-15, *et seq*.**

340.    Plaintiff Altuve repeats paragraphs 1–121 as if fully set forth herein.

341.    The North Dakota Unlawful Sales or Advertising Practices ("North Dakota Act"), N.D.C.C. § 51-15, *et seq.*, provides protection to consumers by mandating fair competition in commercial markets for goods and services.

342.    The North Dakota Act prohibits any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the

sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby. N.D.C.C. § 51-15-02.

343.    The North Dakota Act further prohibits the act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, and such an act is declared to be an unlawful practice. N.D.C.C. § 51-15-02.

344.    The North Dakota Act applies to Defendant's acts as described herein because it applies to any claim for relief by any person against any person who has acquired any moneys or property by means of any practice declared to be unlawful in this chapter. N.D.C.C. § 51-15-09.

345.    Defendant is a "person," as defined by N.D.C.C. § 51-15-01.

346.    Plaintiff Altuve and each member of the North Dakota Subclass are "persons," as defined by N.D.C.C. § 51-15-01.

347.    Defendant's baby food products are "merchandise," as defined by N.D.C.C. § 51-15-01(3).

348.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

349.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the North Dakota Act.

350.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

351.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Altuve and the North Dakota Subclass.

352.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

353.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and N.D.C.C. § 19-02.1-02.

354.    Defendant intended that Plaintiff Altuve and North Dakota Subclass members rely on their respective aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

355.    Plaintiff Altuve and North Dakota Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

356.    Acting as reasonable consumers, had Plaintiff Altuve and North Dakota Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

357.    Plaintiff Altuve and North Dakota Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

64

358.     Acting as reasonable consumers, Plaintiff Altuve and North Dakota Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Altuve and North Dakota Subclass members first purchasing Defendant's baby food products.

359.     As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Altuve and members of the North Dakota Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased those brands of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## COUNT 16
**(On Behalf of Plaintiff Kovacs and the Tennessee Subclass)**
**Violation of the Tennessee Consumer Protection Act ("TCPA"),**
**Tenn. Stat. § 47-18-101, *et seq*.**

360.     Plaintiff Kovacs repeats paragraphs 1–121 as if fully set forth herein.

361.     The Tennessee Consumer Protection Act, Tenn. Stat. § 47-18-101, *et seq*., protects consumers from unfair and deceptive practices and acts.

362.     Plaintiff Kovacs is a consumer under Tenn. Stat. § 47-18-103(3).

363.     Defendant's baby food products are goods, and Defendant is a person who sold its products to Plaintiff Kovacs and Tennessee Subclass members in consumer transactions as those terms are defined under Tenn. Stat. § 47-18-103(8), (14), (20).

364.    Tenn. Stat. § 47-18-104(b)(5), (7), and (9) declare the following acts or practices unlawful:

    a.    Representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

    b.    Representing that goods are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; and

    c.    Advertising goods with intent not to sell them as advertised.

365.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

366.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the TCPA.

367.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

368.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Kovacs and the Tennessee Subclass.

369.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

370.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Tenn. Stat. § 53-1-103.

371. Defendant intended that Plaintiff Kovacs and Tennessee Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

372. Plaintiff Kovacs and Tennessee Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

373. Acting as reasonable consumers, had Plaintiff Kovacs and Tennessee Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

374. Plaintiff Kovacs and Tennessee Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

375. Acting as reasonable consumers, Plaintiff Kovacs and Tennessee Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that those brands of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Kovacs and the Tennessee Subclass members first purchasing Defendant's baby food products.

376. As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Kovacs and members of the Tennessee Subclass suffered damages by

purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 17**
**(On Behalf of Plaintiff Okolo and the Virginia Subclass)**
**Violation of the Virginia Consumer Protection Act of 1977 ("VCPA"),**
**Va. Code § 59.1-196, *et seq*.**

377.    Plaintiff Okolo repeats paragraphs 1–121 as if fully set forth herein.

378.    The Virginia Consumer Protection Act of 1977, Va. Code § 59.1-200, proclaims that the following are fraudulent acts or practices and are unlawful: misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; advertising or offering for sale goods that are used, secondhand, repossessed, defective, blemished, deteriorated, or reconditioned, or that are "seconds," irregulars, imperfects, or "not first class," without clearly and unequivocally indicating in the advertisement or offer for sale that the goods are as such; using deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. Va. Code § 59.1-200(A)(5), (6), (7), (14).

379.    Plaintiff Okolo and each member of the Virginia Subclass are consumers under the VCPA.

380.    Defendant's baby food products are "goods" under the VCPA that were sold to Plaintiff Okolo and the Virginia Subclass members in consumer transactions.

381.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that it brand of baby food contained unsafe levels of Toxic Heavy Metals.

68

382.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts prohibited under the VCPA.

383.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

384.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Okolo and Virginia Subclass members.

385.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

386.    Defendant intended that Plaintiff Okolo and Virginia Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

387.    Plaintiff Okolo and Virginia Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

388.    Acting as reasonable consumers, had Plaintiff Okolo and Virginia Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

389.    Plaintiff Okolo and Virginia Subclass members suffered loss and injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

390.    Acting as reasonable consumers, Plaintiff Okolo and Virginia Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Okolo and Virginia Subclass members first purchasing Defendant's baby food products.

391.    As a direct and proximate result of Defendant's deceptive acts or practices, Plaintiff Okolo and Virginia Subclass members suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

392.    Under Va. Code § 59.1-204(A), (B), Plaintiff Okolo and Virginia Subclass members seek actual damages, or $500, whichever is greater, and treble their actual damages, or $1,000 for Defendant's willful violations of the VCPA. In addition, Plaintiff Okolo and Virginia Subclass members seek reasonable attorneys' fees and costs. Plaintiff Okolo and Virginia Subclass members also seek to enjoin Defendant from further violating the VCPA under Va. Code § 59.1-205.

### COUNT 18
**(On Behalf of Plaintiff Gillens and the Washington D.C. Subclass)**
**Violation of Consumer Protection Procedures Act,**
**D.C. Code § 28-3901, *et seq*. ("CPPA")**

393.    Plaintiff Gillens repeats paragraphs 1–121 as if fully set forth herein.

394.    The CPPA states that it is unfair and deceptive to represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses,

benefits, or quantities that they do not have; represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another; misrepresent as to a material fact which has a tendency to mislead; fail to state a material fact if such failure tends to mislead. D.C. Code §§ 28-3904(a), (d), (e), (f).

395.    Plaintiff Gillens and each member of the Washington D.C. Subclass are consumers. D.C. Code § 28-3901(2).

396.    Defendant's baby food products fall within the CPPA because they meet the definition of "goods and services." D.C. Code § 28-3901(7).

397.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food were safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

398.    Defendant's    misrepresentations,    omissions,    and    concealment    regarding Defendant's baby food products constitute unfair and deceptive acts prohibited under the CPPA.

399.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

400.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Gillens and the Washington D.C. Subclass.

401.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

71

402.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act.

403.    Defendant intended that Plaintiff Gillens and Washington D.C. Subclass members rely on their respective aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

404.    Plaintiff Gillens and Washington D.C. Subclass members reasonably relied on Defendant's respective misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

405.    Acting as reasonable consumers, had Plaintiff Gillens and Washington D.C. Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

406.    Plaintiff Gillens and Washington D.C. Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

407.    Acting as reasonable consumers, Plaintiff Gillens and Washington D.C. Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that those brands of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Gillens and Washington D.C. Subclass members first purchasing Defendant's baby food products.

408.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Gillens and members of the Washington D.C. Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

<strong>COUNT 19</strong><br>
<strong>(On Behalf of All Plaintiffs and the Class and Each State Subclass)</strong><br>
<strong>Fraudulent Concealment</strong>

409.    Plaintiffs repeat paragraphs 1–121 as if fully set forth herein.

410.    As alleged above, the presence of elevated levels of Toxic Heavy Metals in baby food is a material fact to consumers.

411.    Defendant knew that the presence of elevated levels of Toxic Heavy Metals in Defendant's baby food products was a material fact to consumers, such as Plaintiffs and members of the Class.

412.    Because Defendant is responsible for, and control, the manufacturing, marketing, distribution, and sale of Defendant's baby food products, Defendant knew and intended that its omissions and concealment of the presence of elevated levels of Toxic Heavy Metals in its brands of baby food would mislead Plaintiffs and Class members, and induce them to buy products that they would otherwise not have been willing to purchase.

413.    Acting as reasonable consumers, had Plaintiffs and Class members been aware of the true facts regarding Defendant's baby food products they would have declined to purchase those brands of baby food.

414.    Plaintiffs and Class members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

415.    Acting as reasonable consumers, Plaintiffs and Class members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs and Class members first purchasing Defendant's baby food products.

416.    As a direct and proximate result of Defendant's fraudulent concealment, Plaintiffs and members of the Class suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## COUNT 20
### (On Behalf of All Plaintiffs and the Class and Each State Subclass)
### Unjust Enrichment

417.    Plaintiffs repeat paragraphs 1–121 as if fully set forth herein.

418.    Defendant knew that the presence of elevated levels of Toxic Heavy Metals in Defendant's baby food products was a material fact to consumers, including Plaintiffs and Class members.

419.    Because Defendant is responsible for, and control, the manufacturing, marketing, distribution, and sale of Defendant's baby food products, Defendant knew and intended that its omissions and concealment of the presence of elevated levels of Toxic Heavy Metals in its brands

of baby food would mislead Plaintiffs and Class members, and induce them to buy products that they would otherwise not have been willing to purchase.

420.    Acting as reasonable consumers, had Plaintiffs and Class members been aware of the true facts regarding the Defendant's baby food products, they would have declined to purchase those brands of baby food.

421.    Acting as reasonable consumers, Plaintiffs and Class members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs and Class members first purchasing Defendant's baby food products.

422.    As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiffs and members of the Class conferred a benefit on Defendant—*i.e.*, the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

423.    Defendant acquired and retained money belonging to Plaintiffs and the Class as a result of their wrongful conduct—*i.e.*, misrepresenting that Defendant's baby food products were safe for human consumption, and concealing the fact that those brands of baby food contained unsafe levels of Toxic Heavy Metals. Defendant profited at the expense of Plaintiffs and Class members in connection with each individual sale of Defendant's baby food products because Plaintiffs and Class members paid money for products that were worthless due to the fact that they are not safe for human consumption.

424.    Defendant has unjustly received and retained a benefit at the expense of Plaintiffs and the Class because Defendant unlawfully acquired its profits for worthless (and unsafe) baby food products while appreciating and knowing that Defendant's baby food products were unsafe for human consumption, contrary to their misrepresentations and omissions.

425.    Defendant's retention of that benefit violates the fundamental principles of justice, equity, and good conscience because Defendant misled Plaintiffs and the Class into falsely believing that Defendant's baby food products were safe and did not contain unsafe levels of Toxic Heavy Metals in order to unjustly receive and retain a benefit.

426.    Under the principles of equity, Defendant should not be allowed to keep the money rightfully belonging to Plaintiffs and the members of the Class because Defendant have unjustly received it as a result of Defendant's unlawful actions described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Class and Subclasses, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class and/or Subclasses defined herein;

B.    Designating Plaintiffs as representatives of the Class and/or the respective Subclasses, and designating undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Plaintiffs and the Classes and/or Subclasses, and against Defendant;

D.    Awarding Plaintiffs and Class and/or Subclass members all relief to which they are entitled, including awards for their actual damages, statutory damages, treble damages, enhanced damages, and punitive damages for Defendant's willful and intentional conduct;

E.    Ordering equitable relief, including restitution, disgorgement of any of Defendant's ill-gotten gains, imposing a constructive trust in favor of Plaintiffs and the Class and/or Subclass members, and awarding those amounts to Plaintiffs and the Class and/or Subclass members;

F.    Granting injunctive relief, including but not limited to, an order: (1) requiring Defendant to cease its unlawful and deceptive practices; (2) requiring Defendant to implement and maintain adequate manufacturing procedures, final product testing procedures, and ingredient sourcing and inspection practices to ensure their baby food does not contain unsafe and unacceptable levels of Toxic Heavy Metals; and (3) requiring clear and prominent disclosure requirements on Defendant's product packaging regarding the levels of Toxic Heavy Metals in their finished products;

G.    Awarding Plaintiffs and the Class and/or Subclass attorneys' fees and costs, including interest thereon, as allowed or required by law; and

H.    Granting all such further and other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Respectfully submitted,

By: s/Javier Merino
      Javier Merino
      *jmerino@dannlaw.com*
      **Dann Law**
      372 Kinderkamack Road, Suite 5
      Westwood, New Jersey 07675
      (201) 355-3440 telephone

      Thomas A. Zimmerman, Jr.
      (*pro hac vice* anticipated)
      *tom@attorneyzim.com*
      Sharon A. Harris
      (*pro hac vice* anticipated)
      *sharon@attorneyzim.com*
      Matthew C. De Re
      (*pro hac vice* anticipated)
      *matt@attorneyzim.com*
      Jeffrey D. Blake
      (*pro hac vice* anticipated)
      *jeff@attorneyzim.com*
      **ZIMMERMAN LAW OFFICES, P.C**.
      77 W. Washington Street, Suite 1220
      Chicago, Illinois 60602

(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com

Counsel for Plaintiffs and the putative Classes